UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DONNA MARIE SILVERIO, ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 10-40202-FDS |
| ) | |
| MICHAEL ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTION TO REVERSE AND DEFENDANT'S
MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

**SAYLOR, J.**

This is an appeal of the final decision of the Commissioner of the Social Security Administration denying an application for social security disability insurance ("SSDI") benefits. Plaintiff contends that the administrative law judge ("ALJ") failed to comply with the applicable rules and regulations and did not properly evaluate her symptoms and credibility.

Pending before the Court is plaintiff's motion to reverse and the Commissioner's motion to affirm. For the reasons stated below, the motion to affirm will be granted and the motion to reverse will be denied.

**I.      Background**

Donna Silverio is a 56-year-old woman. (Administrative Record at 23). She completed ninth grade. (*Id.*). She has previously worked as a hairdresser, home cleaner, and lab technician.

(*Id.* at 23-24).  She has not worked since the alleged date of the onset of her disability, which is October 1, 1996.  (*Id.* at 12).  Her date last insured is March 31, 1997.  (*Id.*).

### A. Medical History

Silverio testified that she first started noticing medical problems in her late thirties, in particular more frequent headaches and episodes of diarrhea and constipation.  (*Id.* at 24-25).  She was seen by Dr. Mary Hawthorne, her primary-care physician, from at least May 1989 through 2008.  (*Id.* at 347-405).  She saw Dr. Hawthorne periodically for a range of issues, including recurring complaints of gastrointestinal problems, abdominal pain, headaches, depression, anxiety, trouble sleeping, and lower back and shoulder pain.  (*Id.*).  The severity of the symptoms for the various ailments fluctuated, sometimes persisting for a while, and sometimes disappearing for stretches.  (*Id.*).  The frequency of the visits varied, but she generally met with Dr. Hawthorne several times a year.  (*Id.*).

The records also indicate that Silverio saw Dr. Lorin Mimless, a psychiatrist, for depression and anxiety from 1995 to 1996.  (*Id.* at 125).

Silverio had three visits with physicians between October 1, 1996, the alleged onset date, and March 31, 1997, the date last insured.  On October 22, 1996, she complained to Dr. Hawthorne of a sore on her forehead and swelling on the right side of her face and jaw.  (*Id.* at 388).  Dr. Hawthorne diagnosed this as an early abscess formation and right parotitis, and believed it to be of bacterial origin.  (*Id.*).  Dr. Hawthorne prescribed clindamycin, an antibiotic, for a week.  On November 19, 1996, she met again with Dr. Hawthorne.  (*Id.* at 387).  She stated she was having trouble with anxiety and was feeling irritable and impatient more often, and felt that her anxiety medication, Klonopin, was not controlling her symptoms as well as it once had.

(*Id.*).  Dr. Hawthorne prescribed her a higher dose of Klonopin, and also noted that the abscess in her previous visit had cleared up.  (*Id.*).

On January 2, 1997, Silverio met with Dr. Roopa Reddy, another physician in Dr. Hawthorne's office.  (*Id.*).  She reported having episodes of dizziness and nausea over the past two days.  (*Id.*).  Dr. Reddy suspected that this was due to middle ear effusions and labyrinthitis, and instructed her to take decongestants and Antivert for the dizziness and nausea.  (*Id.*).  She also indicated that she was experiencing stiffness and pain in her shoulder and neck.  Dr. Reddy advised her to take Tylenol and use warm packs.  (*Id.*).

Silverio's medical history over the next several years was similar; she saw Dr. Hawthorne several times a year and reported a range of different complaints, including diarrhea, muscle pain, and depression.

From approximately June 2001 through February 2003, she received psychiatric treatment from Dr. Lee Altman.  (*Id.* at 755-68).  In a visit on June 1, 2001, Dr. Altman gave her a global assessment of functioning score of 62.  (*Id.* at 767).[1]

On January 2, 2003, Silverio reported to Dr. Hawthorne that she had been dizzy for the past two days and suffered from headaches.  (*Id.* at 366).  She also reported experiencing vertigo, particularly when turning to the right; some nausea; and black spots in front of her right eye.  (*Id.*).  She said she felt off-balance while walking; those episodes would last a few minutes, but could occur several times a day.  (*Id.*).  Dr. Hawthorne suspected that she had benign positional vertigo.  He prescribed Meclizine to take as necessary, and scheduled an MRI examination of her

---

[1] A global assessment of functioning score of 61-70 indicates "some mild symptoms, or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text revision, 2000)

head.  (*Id.*).  The MRI showed some white matter abnormalities, which led Dr. Hawthorne to refer Silverio to Dr. William Schwartz in the Department of Neurology at UMass Medical Center.  (*Id.* at 733).

On January 22, 2003, Dr. Joan Swearer, Ph.D., performed a neuropsychological assessment of Silverio.  (*Id.* at 626-28).  Dr. Swearer estimated that her general intellectual abilities were borderline to impaired for her age, and noted that some tests suggested frontal lobe dysfunction.  (*Id.*).  Her verbal IQ was 78, her performance IQ was 68, and her full-scale IQ was 71.  (*Id.*).

On August 21, 2003, Silverio returned to the neurology clinic for a follow-up.  (*Id.* at 221-23).  She reported that she felt her memory problems were getting worse, and that although the vertigo symptoms had disappeared completely for a time, they had returned in the past month.  (*Id.*).  Her physician recommended that she see a psychiatrist, based on concerns that her movement disorders could be exacerbated by anxiety.  (*Id.*).  She was also referred to Dr. Peter Riskind for examination for possible multiple sclerosis.  (*Id.*).

On September 15, 2003, Silverio began seeing Dr. Nancy Pratt for psychiatric treatment.  (*Id.* at 750-51).  She continued to have fairly regular follow-ups with Dr. Pratt through at least 2009.  (*Id.* at 738-49).  According to Dr. Pratt's notes, Silverio would sometimes report that she was doing better, and sometimes worse.  Dr. Pratt also changed or adjusted her medications several times.  (*Id.*).

On September 8, 2004, Silverio saw Dr. Riskind and Dr. Maria Dayaw at the neurology clinic for a follow-up examination for possible MS.  (*Id.* at 206-08).  They concluded that her symptoms were consistent with MS and that she probably had the disease, but could not yet

conclude whether it was relapsing remitting MS or primary progressive MS. (*Id.*). They also noted that Silverio was reluctant to undergo any intervention. (*Id.*).

On January 5, 2005, Silverio again saw Dr. Riskind and Dr. Dayaw at the neurology clinic. (*Id.* at 201-02). They concluded that the MS appeared to be the relapsing-remitting form with episodes of vertigo. (*Id.*). They counseled her to receive treatment, but she was again reluctant to do so. (*Id.*). She continued to meet with Dr. Riskind and Dr. Dayaw, as well as Dr. Carolina Ionete, through 2009. (*Id.* at 183-200).

In May 2008, Silverio applied for SSDI benefits. On July 25, 2008, the examiner filed requests for medical advice seeking reviews by an internal medicine specialist for Silverio's physical RFC and a psychology specialist for her mental RFC. (*Id.* at 330-331). On August 8, 2008, Dr. Lawrence Langer, Ph.D., completed a Psychiatric Review Technique for Disability Determination Services ("DDS") based on Silverio's records from October 1, 1996, through March 31, 1997. Dr. Langer found that there was insufficient evidence to find a psychiatric impairment. (*Id.* at 332-345). His notes indicated that his review found no mention of any psychiatric limits or limits due to anxiety. (*Id.*). Dr. Romany Hakeem Girgis completed the physical review and found no medical evidence of MS from October 1, 1996, through March 31, 1997 and concluded that there was insufficient evidence for a finding of disability. (*Id.* at 346). He noted that Silverio had been diagnosed with the condition in 2003, but had not been treated for MS since, and that there were no clinical or radiological findings for MS in the prior three years. (*Id.*).

On September 15, 2008, Dr. Pratt filled out a psychiatric disorder form for DDS. (*Id.* at 632-34). The report stated that Silverio suffered from depression and anxiety that at times

limited her ability to complete household tasks and drive on the highway. (*Id.*). She was generally able to take care of her home and family and interact appropriately with family and did not require excessive supervision. (*Id.*). Dr. Pratt's prognosis was "fair with ongoing treatment, but depression and anxiety have been recurrent." (*Id.*).

After Silvero's initial application was denied, she filed a request for reconsideration. A further medical review was conducted on October 6, 2008. Dr. Ginette Langer, Ph.D., completed a Psychiatric Review Technique that concluded that there was insufficient evidence to assess functioning prior to the date last insured. (*Id.* at 639-51). Dr. Langer noted that Silverio had taken Xanax as prescribed by Dr. Hawthorne, but also that she had not been treated by a psychiatrist or mental health professional and no limitations were noted in her records. (*Id.*). A medical review by Dr. S. Ram Upadhyay found insufficient evidence as to medical issues prior to March 31, 1997, as the earliest treatment was in 2003, and a July 2008 report from Dr. Riskind indicated a stable neurological examination. (*Id.* at 653).

On January 19, 2010, Dr. Ionete completed a medical statement concerning MS for the SSDI claim. In that statement, Dr. Ionete indicated that an earliest onset date of 2003 for symptoms of MS. (*Id.* at 808). She also enclosed a clinical note from a visit on December 17, 2009. (*Id.* at 809-11). At that visit, Silverio reported that she was very slowly getting worse, with increased difficulties with walking, fatigue, and mild bladder problems. She also denied having any vision changes, vertigo, falling, or any relapses of MS symptoms. (*Id.*).

On March 30, 2010, Dr. Hawthorne wrote a letter in which she stated that Silverio had come to her with complaints of dizziness and fatigue on January 2, 1997. (*Id.* at 813). Dr. Hawthorne stated that it was her medical opinion that those symptoms were secondary to the

onset of MS and that the symptoms made it difficult for Silverio to work and forced her to take unscheduled breaks. (*Id.*).

### B. Procedural Background

On May 28, 2008, Silverio applied for Social Security disability benefits, with a listed onset of disability date of October 1, 1996. (*Id.* at 10). The application was denied initially on August 14, 2008, and upon reconsideration on October 7, 2008. (*Id.*). On November 25, 2008, she requested a hearing, which was held on January 12, 2010. (*Id.*). Silverio was represented by counsel at the hearing. (*Id.*). Both Silverio and a vocational expert testified at the hearing. (*Id.*). On May 20, 2010, the ALJ issued a decision finding that she was not disabled. (*Id.* at 7).

The Decision Review Board selected the decision for review. (*Id.*). Silverio's counsel filed a written statement with the Decision Review Board arguing that the ALJ did not follow SSR 83-20, that Silverio's MS was present and severe prior to diagnosis in 2003. (*Id.* at 175-78). It also contended that the ALJ did not properly evaluate medical evidence and did not properly consider her testimony. (*Id.*). On August 13, 2010, the Decision Review Board affirmed the ALJ's decision. (*Id.* at 1). It found that the medical evidence did not show manifestations of MS or severe work limitations as of the date last insured and that the ALJ properly evaluated the opinion of Dr. Hawthorne. (*Id.* at 1-2). On October 15, 2010, Silverio filed this complaint.

### III. Analysis

### A. Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing. 42 U.S.C. §

405(g). The Commissioner's factual findings, "if supported by substantial evidence, shall be conclusive," 42 U.S.C. § 405(g), because "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ. It does not fall on the reviewing court." *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001) (citation omitted); *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) (noting that the court "must affirm the Secretary's resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence"). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). An ALJ's findings of fact are not conclusive if they are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.2d 31, 35 (1st Cir. 1999). Questions of law, to the extent that they are at issue in the appeal, are reviewed *de novo*. *Seavey*, 276 F.3d at 9.

      **B.**     **Standard for Entitlement to SSDI Benefits**

An individual is not entitled to SSDI benefits unless he or she is "disabled" within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423(a)(1), (d) (setting forth the definition of disabled in the context of SSDI). "Disability" is defined, in relevant part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be severe enough to prevent the plaintiff from performing not only past work, but any substantial gainful work existing in the national economy. 42 U.S.C. §

423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed impairments' in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that he . . . can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).[2] "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the Commissioner at step five to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). At that juncture, the ALJ assesses the claimant's RFC in combination with the "vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. § 404.1560(c)(1), to determine whether he or she can "engage in any . . . kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

### C.     The Administrative Law Judge's Findings

In evaluating the evidence, the ALJ followed the five-step procedure set forth in 20 C.F.R. § 404.1520(a)(4).

At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity from October 1, 1996, the alleged onset date, through March 31, 1997, her date last

---

[2] "All five steps are not applied to every applicant, as the determination may be concluded at any step along the process." *Seavey*, 276 F.3d at 5.

9

insured. (AR at 12).

At the second step, the ALJ determined that as of the date last insured, plaintiff's anxiety constituted a medically determinable impairment. (*Id*.). However, the ALJ found no basis for the imposition of significant functional limitations due to anxiety. (*Id*.). The ALJ also found that the medical evidence of symptoms attributed to MS by plaintiff did not support a finding of significant functional limitations. The ALJ concluded that plaintiff did not have a severe impairment or combination of impairments that imposed a significant functional limitation prior to the date last insured.

Plaintiff contends that the ALJ erred as a matter of law in her decision.[3] Specifically, she contends that the ALJ failed to apply the framework required by Social Security regulations and rulings and did not properly evaluate her credibility.

### D.     Compliance with Social Security Regulations and Rulings

Plaintiff contends that the ALJ erred as a matter of law in assessing the evidence relating to the onset date and did not apply the correct legal standards—specifically, Social Security Ruling ("SSR") 83-20. Social Security Rulings are binding on the Social Security Administration, including ALJs. *McDonald v. Sec'y of Health & Human Servs.*, 795 F.2d 1118, 1125 (1st Cir. 1986). SSR 83-20 identifies the relevant evidence to be used in establishing an onset date of disability. For disabilities with a non-traumatic origin, medical evidence is the primary element to be considered, along with a claimant's allegations and work history, if any. SSR 83-20. An individual's allegations and work history are significant only if they are

---

[3] Plaintiff contends that she is arguing only legal error and "[s]ubstantial evidence is simply not an issue." (Pl. Reply Br. at 2). However, plaintiff's arguments, especially those concerning the medical evidence and her credibility, are questions that raise the issue of substantial evidence and will be treated as such.

consistent with the medical evidence. *Id.* For slowly progressive impairments, an onset date may be inferred from the medical and other evidence, but such a judgment must have a legitimate medical basis. *Id.*

An ALJ is not required to consider SSR 83-20 unless the ALJ first finds that the claimant was disabled at some point prior to the date last insured. *See McDonald v. Astrue*, 2011 WL 3562933, at *10 (D. Mass. Aug. 15, 2011); *Biron v. Astrue*, 2010 WL 3221950, at *6 (D. Mass. Aug. 13, 2010); *see also Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004) (finding that SSR 83-20 addresses a scenario in which the ALJ finds a claimant is disabled at the time of application and is seeking to determine if the disability onset was an earlier time); *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997).

Plaintiff's initial brief contended that the ALJ did not properly apply the framework set out in SSR 83-20. (Pl. Br. at 10-19). Her reply brief, however, states that she does not take issue with prior determinations of the Court regarding the application of SSR 83-20, and argues that the ALJ made an improper evaluation of her impairments during the relevant period. (Pl. Reply Br. at 2). The reply brief appears to concede that SSR 83-20 is not binding in this case and the ALJ therefore did not err by incorrectly applying it.

Plaintiff's arguments regarding SSR 83-20 are without merit even if the regulation were binding. Plaintiff contends that the ALJ rejected evidence from the period prior to onset, and only considered evidence from the period during which she was insured. (Pl. Br. at 11). However, the ALJ began her review of the medical records in October 1995, a year before the alleged onset. (AR at 13). The ALJ also discussed the fact that nothing in the medical records showed any reports of dizziness after the initial report in January 1997 until 2003; she

specifically mentioned four subsequent visits with Dr. Hawthorne in 1997, all of which occurred after the date last insured.  (*Id.* at 15).

Plaintiff argues that the ALJ should have called on a medical advisor.  SSR 83-20 states that an ALJ "should call on the services of a medical advisor when onset must be inferred."  An ALJ is only required, however, to obtain a medical expert to determine an onset date after first making a finding of disability.  *See Klawinski v. Comm'r of Social Sec.*, 391 Fed. Appx. 772, 775 (11th Cir. 2010); *Hill v. Astrue*, 289 Fed. Appx. 289, 294 (10th Cir. 2008); *see also Mason v. Apfel*, 2 F. Supp. 2d 142, 149 (D. Mass. 1998) (holding that "when no legitimate medical basis can support an inference of disability, no medical advisor is necessary.").  Here, because the ALJ found no objective support for a finding of disability, no medical advisor was necessary.

### E.     Medical Evidence

Plaintiff contends that the ALJ did not properly weigh the medical evidence and rejected legitimate medical opinions.  A treating source's opinion that is "well supported by medically and clinically acceptable diagnostic techniques and is not inconsistent with other substantial evidence" is given controlling weight.  20 C.F.R. § 404.1527(d).  Opinions that are not given controlling weight are valued based on the length, nature, and extent of the treatment relationship, support from medical evidence, consistency of the opinion, specialization of the doctor, and any other relevant factors.  *Id*.  The lack of evidence of sustained treatment supports a finding that a claimant is not disabled.  *Irlanda Ortiz v. Sec'y of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).

The ALJ gave little weight to Dr. Hawthorne's March 2010 letter, in which she opined that plaintiff's dizziness and fatigue were secondary to MS and made it difficult for her to work.

(AR at 15).  The ALJ found that there was no actual objective support to show that the dizziness caused significant functional limitations prior to the date last insured, as the dizziness occurred several months after the alleged onset date, lasted only two or three days, and was not reported subsequently.  (*Id.*).  The ALJ further noted that Dr. Ionete, a neurology specialist, identified the onset of symptoms as "2003," and that plaintiff's next report of dizziness did not occur until January 2003, six years later.  (*Id.*).  Although a treating physician's opinion is generally entitled to significant weight, the ALJ's finding that there was no objective support for Dr. Hawthorne's opinion is supported by substantial evidence and will not be overturned.

Plaintiff argues that Dr. Hawthorne's notes show the presence of other symptoms frequently associated with MS, such as abdominal pain and distress, depression, and headaches. (Pl. Br. at 17).  While these could be symptoms of MS, the medical records do not show a link between those symptoms and MS.  In fact, the records suggest that on a number of occasions these symptoms were not due to MS.  (*See e.g.,* AR at 403).  Plaintiff's records also indicate that the symptoms were either intermittent or under control, and do not support a finding that they were disabling.

Plaintiff also points to Dr. Swearer's neuropsychological assessment in January 2003, which found that her general intellectual functioning was borderline-to-impaired and rated her performance IQ as 68.  She contends that the IQ finding by itself is sufficient to show that she had a serious disease and severe impairment.  (Pl. Reply Br. at 7).  Listing 12.05 states that the required level of severity for mental retardation is (1) a performance IQ between 60 and 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function, or (2) such an IQ and two of the following four:  (a) marked restriction of

activities of daily living; (b) marked difficulties in maintaining social functioning; (c) marked difficulties in maintaining concentration, persistence, or pace; and (d) repeated episodes of decompensation, each of extended duration.  20 C.F.R. Part 404, Subpart P, App. 1.  Plaintiff's performance IQ alone is insufficient to show a severe impairment; additional limitations must be shown. *See id.*  Plaintiff argues that the probable cause of the impaired mental functioning is MS, and because the disease is progressive, she must have developed this prior to the date of the examination.  However, these contentions are unsupported by any evidence in the record or any medical opinion.  Even accepting these contentions as true, this does not mean that the impairment existed as of the date last insured, which was almost six years earlier.  The ALJ's determinations concerning the medical evidence are therefore supported by substantial evidence.

### F.     Plaintiff's Credibility

Plaintiff contends that the ALJ ignored her testimony in finding that she did not suffer from significant functional limitations.  As a general matter, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated h[er] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference. . . ."  *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) (citing *DaRose v. Sec'y of Health & Human Servs.*, 803 F. 2d 24, 26 (1st Cir. 1986)).  However, the ALJ "must make specific findings as to the relevant evidence [s]he considered in determining to disbelieve" the plaintiff.  *Da Rosa v. Sec'y of Health and Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986).

Alleged functional limitations and restrictions due to symptoms must be reasonably consistent with medical evidence and other evidence, including statements and reports by the claimant and treating sources.  20 C.F.R. § 404.1529.  Factors considered in assessing the

severity of symptoms include daily activities; location, duration, frequency, and intensity of symptoms; type, dosage, effectiveness, and side effects of medication; and treatment or any other measures used to relieve symptoms. *Id.*; *see also Avery v. Sec'y of Health and Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986). An ALJ is not required to discuss specifically all these factors in making a decision. *Deforge v. Astrue*, 2010 WL 3522464, at *9 (D. Mass. Sept. 9, 2010).

Plaintiff contends that the ALJ did not consider her testimony and failed to make specific findings as to why her testimony was not credible. (Pl. Br. at 15). The ALJ went through her medical records in detail, starting from October 1995, a year before the alleged onset date, through April 1997, a month after the date last insured. She noted that there was only a single episode of dizziness lasting two to three days, and no subsequent mentions in the records of later medical visits. (AR at 14-15). The ALJ also discussed Dr. Hawthorne's March 2010 letter and Dr. Ionete's January 2010 report. (*Id.*). Based on this evidence, the ALJ concluded that the alleged symptoms could not be supported by the objective medical evidence. That finding is supported by substantial evidence.

Plaintiff argues that objective medical evidence should not be the sole indicator of a her impairments. She points to SSR 96-7p, which contains a list of factors that an ALJ is to consider in evaluating a claimant's credibility, and language that states that symptoms can suggest a greater level of severity than objective medical evidence can show. (Pl. Reply Br. at 3). However, in this case, the ALJ did not need to reach those considerations. Under SSR 96-7p, "[n]o symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or

mental impairment(s) that could reasonably be expected to produce the symptoms." The ALJ must first find that a claimant's symptoms are supported by objective medical evidence before the claimant's credibility is examined.  In this case, the ALJ did not make such a finding.

### III.   Conclusion

For the foregoing reasons, plaintiff's motion to reverse the decision of the Commissioner is DENIED, and the Commissioner's motion to affirm is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: March 21, 2012